**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TYRIK McCLELLAN,

      Petitioner,

                                CASE NO. 2:08-CV-10735
v.                               HONORABLE BERNARD A. FRIEDMAN
                                UNITED STATES DISTRICT JUDGE

LLOYD RAPELJE,

      Respondent.

_____/

## OPINION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

      Tyrik McClellan, ("Petitioner"), a state prisoner confined at the Saginaw Correctional

Facility, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

Petitioner challenges his Wayne Circuit Court jury trial conviction for first-degree murder,

MICH. COMP. LAWS 750.316,  felon in possession of a firearm, MICH. COMP. LAWS 750.224f,

and possession of a firearm during the commission of a felony. MICH. COMP. LAWS

750.227b. The Court held an evidentiary hearing on Petitioner's claim that his trial counsel

was ineffective for failing to call a number of witnesses at trial.  For the reasons stated

below, the Court finds that Petitioner has demonstrated that he is being held in state

custody in violation of his Sixth Amendment right to the effective assistance of counsel.

The Court will therefore grant the writ of habeas corpus and order that Respondent release

---

[1]

Petitioner has been transferred to the Saginaw Correctional Facility.  The proper
respondent in a habeas case is the warden of the facility where the petitioner is
incarcerated. *See Edwards Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See
also* Rule 2(a), 28 U.S.C. § 2254.  Therefore, the Court substitutes Warden Lloyd
Rapelje in the caption.

Petitioner from custody within ninety (90) days.

## I. <u>Background</u>

Petitioner's convictions arise from the shooting death of Iva Nathan Auld outside a downtown Detroit bar in the early morning hours of December 20, 2001.  Many of the essential facts were not in dispute at Petitioner's trial.  There was an altercation inside the bar between two groups of men.  Both groups were asked to leave the bar, and the altercation continued outside.  At some point Auld rushed towards Petitioner, and Petitioner shot him to death.  Petitioner admitted to shooting Auld but claimed that he did so in self-defense.

The evidence presented at trial consisted of the testimony of several men from Auld's group, two employees of the bar, and the medical examiner.  No defense witnesses were called.

Six of Auld's companions testified at trial to relatively consistent accounts of the confrontation.  The two groups of men got into an argument in the bar at around closing time, and so they were escorted out of the bar separately.  Auld's group left first, and Petitioner's group left a few minutes later.  Outside the bar, one of the men from Auld's group, Fred Hill, retrieved a metal rod from a car and confronted Petitioner's group as they were leaving the bar.  Petitioner then drew a pistol and held it at his side.  Another man from Petitioner's group announced "first person who throws a punch, start busting (shooting)," and then he knocked Hill out with a single punch.  As the two groups started to tussle, Petitioner shot Auld four times.

Joseph Richardson testified that after Hill was knocked-out, Auld "tussled" with

2

Petitioner for about 20-to-30 second and then fell backwards.  Richardson did not see Auld make any threatening gestures towards Petitioner other than the tussling, and he heard the gunshots before Auld fell to the ground.  Richardson testified that Petitioner was against a wall when he fired, but that he could have retreated down the adjacent alley.

James Puriefoy testified that he made it as far as the car with Hill and Mandel Mays when he noticed that the other members of the group had not made it to their cars. Puriefoy saw Hill get out of the car and head back to the bar, and Puriefoy and Mays followed him.  Puriefoy testified that Hill squared off with someone from Petitioner's group, and Hill was knocked to the ground.  Puriefoy saw that Petitioner was holding a handgun. Puriefoy then saw Petitioner back-peddle towards the parking lot and heard shots.  Puriefoy did not see anyone else with a weapon beside Petitioner.  He did not see Auld do anything threatening before the shots were fired, and he testified that Auld was not moving towards Petitioner when he was shot.

Kevin Thompson testified that he heard Puriefoy yell "he's got a gun."  Thompson saw Hill fall down, and then he heard shots being fired.  He did not see anyone with a weapon.

Leonard Strickland testified that he left the bar with Auld and Hill.  A person from Petitioner's group punched Hill and knocked him to the ground.  Strickland began tussling with someone from Petitioner's group.  He heard someone say "he's got a gun, he's got a gun, let's go," and then he heard gunfire.  Strickland never saw anyone with a weapon.

Mandel Mays testified that he drove Hill and Puriefoy to the bar.  He placed a security club for locking the steering wheel in the back seat of his car.  After they reached May's car, Hill will went into the back seat and then ran out of the car towards the bar.

3

Mays followed him.  The groups of men converged and someone knocked out Hill.  He heard the individual who punched Hill say "if anybody move, blast all of them," and two seconds later he heard shots.  He also heard someone from Petitioner's group say that Auld's group had guns.

Fred Hill admitted that he retrieved the club from Mays's car and took it back to the bar.  He testified that he had a verbal confrontation with Petitioner's group, but threw the club down just before he was knocked out.  Hill did not remember anything after he was punched.

Two employees of the bar also testified regarding their observations.  Dwight Stephenson testified that he was a security guard and did not know any of the men involved.  He testified about the argument occurring inside the bar, and that the two groups of men were escorted out separately.  It looked to Stephenson like it was Auld's group that came back towards the bar and started arguing again with Petitioner's group.  Stephenson saw an individual from Petitioner's group emerge from the bar, take off his coat, tighten his cap, and announce at least three times, "first one that swings, start busting."  He then punched Hill once, knocking him out.

Stephenson then saw Auld "rush" Petitioner's group, but he did not make contact. Petitioner had his gun drawn, but before Auld could grab his arm, Petitioner fired.  Stephen testified that Auld "was falling. . . it looked like as he was trying to get away, he slipped, and it looked like he was falling before he even got shot." Trial Tr. II, at 136.  Stephenson testified that the shots were fired after the victim was already on the ground, and he saw the sparks on the concrete.  Stephenson could see Auld's hands, and because Auld was only wearing a tee-shirt, he could see that Auld did not possess any kind of weapon.

4

Although Petitioner was backed up to the wall before he shot Auld, Stephenson testified that he could have escaped: "the person that did the shooting wasn't going anywhere. He meant to shoot him."  Trial Tr. II, at 153.

Stephenson also testified that he patted-down every patron of the bar, and that no one had a gun inside the building.  Accordingly, Stephenson reasoned that Petitioner must have obtained the gun after he left the bar.

Niko Simmons testified that he also worked at the bar.  He testified that he saw Hill retrieve the metal rod from a car, put it in his trousers, and approach the bar.  While Hill began arguing in front of the bar, two more men from Petitioner's group came out of the bar.  One of the men knocked Hill out.  Simmons did not see anyone take the metal rod from Hill after he was knocked out.  Simmons then saw Petitioner step back and rack a round into the chamber of his gun.  Auld tried to grab the gun or swing at Petitioner. Petitioner was standing at the end of a wall, almost in an alley, when Auld was punching at him and trying to get the gun.  Petitioner stepped back a few feet, creating a little separation, and then he shot Auld.

The only other testimony came from the medical examiner.  Dr. Boguslaw Pietak testified that Auld had four gunshot wounds.  The lethal shot entered Auld's upper left rear shoulder and exited his front right upper chest.  The track of this wound was from back to front and from left to right.  Pietak testified that the victim was not facing the shooter when this wound occurred.  The remaining wounds were to Auld's legs and entered the victim's body at differing angles.  Dr. Pietak could not determine the order that the wounds were inflicted, and he could not determine the position of the body when the victim was shot.  He did testify, however, that the victim's body must have been in motion during the shooting.

5

No one from Petitioner's group was called to testify, and Petitioner did not testify in his own defense.

Based on this evidence, Petitioner was convicted of first-degree murder and two firearm offenses.  Following sentencing, Petitioner pursued an appeal as of right in the Michigan Court of Appeals.  His appellate brief raised three claims:

> I. The evidence was insufficient to establish the elements of premeditation and deliberation for first-degree murder.
>
> II. The prosecutor committed misconduct by his remarks in opening statement and closing argument.
>
> III. The jury instructions regarding the order of deliberations was erroneous.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *People v. McClellan*, 2004 Mich. App. LEXIS 1324 (Mich. Ct. App. May 25, 2004).  Petitioner then filed an application for leave to appeal in the Michigan Supreme Court that raised the same issues, but the application was denied by form order.  *People v. McClellan*, 471 Mich. 950; 690 N.W.2d 112 (2004).

Petitioner returned to the trial court and filed a motion for relief from judgment.  The motion raised three claims:

> I. Petitioner was denied the effective assistance of counsel.
>
> II. There was cumulative error that rendered Petitioner's trial unfair.
>
> III. Trial counsel was ineffective for offering a self-defense argument without presenting any witnesses to support it.

Petitioner also filed a motion for an evidentiary hearing to support his claims of ineffective assistance of counsel.  The trial court denied the motion by an opinion dated July 19, 2006.  The parties now agree that the opinion based the denial of relief based on

Petitioner's failure to demonstrate cause and prejudice under Michigan Court Rule 6.508(D)(3).

Petitioner then retained his present counsel and appealed the decision of the trial court to the Michigan Court of Appeals. The application requested, as an alternative request to relief, that the case be remanded to the trial court for an evidentiary hearing. The application and request for a hearing were supported by the affidavits of three members of Petitioner's group who witnessed the fight and shooting, and with Petitioner's own affidavit.

Petitioner's application for leave to appeal was denied "for lack of merit in the grounds presented." *People v. McClellan*, 2007 Mich. App. LEXIS 2973 (Mich. Ct. App. Aug. 30, 2007). Petitioner's subsequent application for leave to appeal filed in the Michigan Supreme Court was denied for failure "to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)." *People v. McClellan*, 480 Mich. 1006; 742 N.W.2d 367 (2007).

Petitioner then filed the instant petition for writ of habeas corpus. The Court granted Petitioner's motion for an evidentiary hearing on his claim that his trial counsel was ineffective for failing to call eyewitnesses from Petitioner's group at trial. A hearing was held on April 6, 2011. Petitioner presented eight witnesses at the hearing. Kyle McClellan, Calvin Guinn, Ramu McClellan, and Dialo McClellan, testified about their account of the shooting. Cecily McClellan, Petitioner's aunt, testified about her contacts with Petitioner's trial and appellate attorneys. Jeffery Edison, Petitioner's trial counsel, testified about his reasons for not calling any defense witnesses. Jonathan Simon, Petitioner's appellate counsel, testified about his conduct during Petitioner's appeal of right. Finally, Petitioner

7

testified about the shooting and his interactions with his counsel.  Respondent did not call any witnesses.

Kyle McClellan testified at the hearing that he and Petitioner met-up with his brothers Diallo and Ramu at the bar.  The four men entered the bar together.  Kyle saw Petitioner hide a 9mm handgun in his waistband before entering the bar.  Because Petitioner was underage and armed, Kyle and the other two men obstructed the view of the security guard so Petitioner could sneak into the bar without being searched.

Kyle testified that during the altercation outside the bar, he heard the man who was punched (Fred Hill) threaten to shoot someone in Petitioner's group.  After Hill fell to the ground, he dropped a chrome object that Kyle thought was a gun.  He then saw the deceased (Auld) pick up that object and rush towards Petitioner and Calvin Guinn.  Kyle then heard shots.  Kyle never talked to either of Petitioner's attorneys and was told by Petitioner that he would not be needed at trial.

Calvin Guinn corroborated Kyle's testimony about how Petitioner snuck into the bar with the handgun.  Guinn also testified that he was standing next to Petitioner during the fight outside the bar.  He saw Auld grab an object from Hill's waistband after Hill was on the ground and then rush towards Petitioner.  He described Auld as being over six feet tall and weighing around 280 pounds, while Petitioner was five-eight and 130 pounds.  Guinn saw Petitioner, who was against a wall, pull out his pistol and start shooting at Auld.  Auld fell to the ground and dropped the object, which Guinn said turned out to be a pistol.  Guinn admitted that he gave a statement to police in which he denied seeing the shooting, but he explained that he was scared and did not want to implicate Petitioner.  Guinn never spoke to Petitioner's attorney and heard that he was not needed at trial.

8

Ramu McClellan also testified about sneaking Petitioner into the bar with a handgun. Ramu testified that during the altercation outside the bar, Hill put his hand in his pocket and said "you don't want to mess with us." When Hill was knocked-out, a shiny object fell to his side that Ramu assumed was a weapon. Ramu saw Auld pick up the object and run towards them. Ramu heard shots, but he denied seeing the shooting. Ramu was never contacted by the police or by any lawyers.

Diallo McClellan testified that Petitioner entered the bar without being searched. Diallo was not present outside the bar and did not witness the altercation or shooting.

Cecily McClellan testified that she is Petitioner's aunt. She attended the trial and was told by defense counsel that he would not call any defense witnesses because the prosecutor had the burden of proof. After trial, she wrote a letter to Petitioner's appellate counsel which expressed a concern about the failure to call defense witnesses, but she never received a response.

Jeffrey Edison testified that he was retained to represent Petitioner at trial. After speaking with Petitioner he decided to present a claim of self-defense. During his conversations, Petitioner told him about people who he was with at the bar. Edison also knew from reviewing discovery materials that there were people present from Petitioner's group who witnessed the altercation outside the bar. Edison had no recollection of contacting potential defense witnesses, but he recalled talking to some family members. Edison testified that he did not talk to any of the four eyewitnesses who testified at the hearing. He did not send any letters to any potential witnesses, and he did not use a private investigator to contact any either. Edison made the decision not to call any defense witnesses at the close of the prosecutor's case because he believed the prosecutor

9

presented insufficient evidence to rebut Petitioner's self-defense claim.

Edison described his thinking as follows:

> I don't think the prosecutor had come close to at all on murder in the first degree. The whole focus of our defense was whether the prosecutor could support what they believed to be in the charges, Mr. McClellan's state of mind. All the evidence from all the witnesses if I recall correctly reasonably supported at least or at most a state of mind that provoked a response to the excitement and emotions of the moment. Hearing. Tr. at 152-153.

He further testified that "strategically as defense trial attorney . . . one of my objectives would be to try to elicit as much evidence as I can from the witnesses that are presented by the prosecution to support any defense that I intend to raise so that the when the prosecution rests the defense is in the best position to move forward without calling any witnesses, if possible." Id. at 149. Edison testified that there "[t]here's always risks" in calling defense witnesses. Id. at 149.

Jonathan Simon testified that he represented Petitioner during his direct appeal. Simon did not have any recollection of speaking with Petitioner or Edison about Petitioner's case. He had no recollection of reading Cecily McClellan's letter or a letter from Petitioner. Simon also did not recall the process of developing the issues for Petitioner's appeal.

Petitioner testified at the hearing that when he met Edison in the county jail he admitted shooting Auld but said he did so because Auld had picked up what he thought was a gun and tucked it under his shirt before he rushed at Petitioner. Petitioner testified to sneaking into the bar with the handgun. He told Edison the identities of the people whom he was with at the bar.

Petitioner testified that Edison told him that he did not need any witnesses and to let the prosecutor prove his case. Petitioner told his family that Edison did need them as

witnesses.  Edison also advised Petitioner not to have his family come to court for the trial.

Petitioner testified that he wrote a letter to Simon complaining that Edison had not called any defense witnesses, and the letter gave Simon the names of Guinn, Diallo, Kyle, and Ramu.  Simon never responded to the letter.

## II.  Analysis

## A. Standard of Review

28 U.S.C. § 2254(d) does not restrict review of Petitioner's ineffective assistance of trial counsel claim because the state courts did not adjudicate the claim on the merits.  In both post-hearing briefs, the parties acknowledge that the trial court found Petitioner's claim to be procedurally defaulted under Michigan Court Rule 6.508(D)(3) because Petitioner failed to demonstrate "good cause" for his failure to raise the claim during his appeal of right.  The parties are correct.  The trial court's decision rests on an independent and adequate state procedural ground.  *Malone v. Sherman*, 2011 U.S. App. LEXIS 3757, *3-4 (6th Cir. 2011).  The parties also agree that the Michigan Court of Appeals' subsequent summary denial of Petitioner's application for leave to appeal "for lack of merit in the grounds presented" does not constitute an adjudication on the merits under *Harrington v. Richter*, 131 S.Ct. 770 (2011).  Lastly, the parties agree that review of Petitioner's claim is barred absent a showing of cause and prejudice.  *See* Petitioner's Supplemental Brief, at 32-34; Respondent's Supplemental Brief, at 8-9.  If Petitioner demonstrates cause and prejudice, the Court then reviews his ineffective assistance of counsel claim de novo. *Middlebrooks v. Bell*, 619 F.3d 526, 534 (6th Cir. 2010) (When a state court does not address the merits of a claim, federal review is de novo.)

11

### B.  Cause and Prejudice - Ineffective Assistance of Appellate Counsel

The first question, then, is whether Petitioner has demonstrated cause and prejudice to excuse his procedural default.  In order to establish "cause," a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Haliym v. Mitchell*, 492 F.3d 680, 690-91 (6th Cir. 2007) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  "Prejudice," meanwhile, "requires a showing that errors at trial 'worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Haliym*, 492 F.3d at 690-91 (quoting *United States v. Frady*, 456 U.S. 152, 168(1982)).

Petitioner asserts that his appellate counsel's failure to raise his ineffective assistance of trial counsel claim during his appeal of right constituted ineffective assistance of appellate counsel, establishing cause to excuse his default.  "Attorney error may constitute cause if it rises to the level of constitutionally ineffective assistance of counsel." *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003).  Petitioner must demonstrate that his appellate counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of his appeal would have been different. *Goff v. Bagley*, 601 F.3d 445, 462-63 (6th Cir. 2010).

An attorney representing a criminal defendant pursuing an appeal of right in Michigan has an obligation to investigate the possibility of raising claims that are not supported by the existing trial record and require further factual development in the trial court. *See People v. Ginther*, 390 Mich. 436, 443-444; 212 N.W.2d 922 (1973), and *Smith*

12

*v. Hofbauer*, 312 F.3d 809, 821, n.2 (6th Cir. 2002). When a defendant wishes to raise a claim of ineffective assistance of counsel based on facts not contained in the existing record, he must request a so-called *Ginther* hearing. A request for such an evidentiary hearing must be accompanied by affidavits or other offer of proof as to the evidence the defendant wishes to present at the hearing. MICH. CT. RULE 7.211(C)(1).

In the present case, Petitioner's appellate counsel performed deficiently by failing to investigate Petitioner's claim of ineffective assistance of trial counsel and by failing to request a *Ginther* hearing to support it. Simon had no independent recollection of Petitioner's appeal. But both Petitioner and his aunt testified that they sent letters to Simon informing him of the basis for investigating a possible ineffective assistance of trial counsel claim. The Court finds their testimony in this regard to be credible and supported by copies of the letters they sent to Simon. The letters contained enough detail to inform Simon of the basis for at least investigating the possibility of raising a claim that Petitioner's trial counsel was ineffective for failing to call the defense witnesses mentioned. Yet the evidence shows that Simon completely ignored this lead - all of the defense witnesses testified that they were never contacted by Simon.

The Court finds that an adequate investigation into Petitioner's claim would likely have led to the discovery of the defense witnesses and to the production of affidavits in support of a request for an evidentiary hearing as required by *Ginther* and Rule 7.211(C)(1). The fact that the defense witnesses cooperated with Petitioner's present counsel and testified at the hearing in this Court shows that they likely would have done the same thing had they been contacted by Simon during the appeal of right.

The Court recognizes that strategic and tactical choices regarding which issues to

13

pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  And the Supreme Court has held that a petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983).  But Simon never made a strategic decision not to raise the instant ineffective assistance of trial counsel claim - he failed to investigate the possibility of raising the claim altogether.  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Parrish Towns v. Smith*, 395 F.3d 251, 258 (6th Cir.2005) quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991).  "[W]here counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release', counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992)(internal citations omitted).  Accordingly, by failing to follow-up on leads given to him by Petitioner and his aunt, and limiting his review of the appeal only to issues apparent in the record, Simon performed deficiently.

Had Simon conducted an adequate investigation, there is a reasonable probability that the outcome of Petitioner's appeal would have been different.  For the reasons stated below, not only did Simon miss a substantial claim, he missed one that has merit.  There is a reasonable probability that had the state court been presented with the evidence that was presented to this Court, Petitioner's conviction for first-degree murder would have been reversed.  Petitioner has therefore demonstrated that he was denied the effective assistance of appellate counsel and has shown cause to excuse his default.

14

Petitioner has also demonstrated the prejudice prong of the cause-and-prejudice test. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (*citing Frady*, 456 U.S. at 170-71. For the reasons stated below, the default of Petitioner's ineffective assistance of trial counsel claim worked to Petitioner's actual and substantial disadvantage because had trial counsel presented the uncalled defense witnesses at trial, there is a reasonably probability he would have prevailed on his claim of self-defense.

## C. Ineffective Assistance of Trial Counsel

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

15

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384(1986) (quoting *Strickland*, 466 U.S. at 690). "In any ineffectiveness case, a particular decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).  To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that the witness's testimony would probably have changed the outcome of the trial. *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996).

Petitioner's counsel performed deficiently by failing to investigate potential defense witnesses.  Based on his conversations with Petitioner and his review of discovery materials, Petitioner's trial counsel made the strategic decision to defend the case by claiming that Petitioner acted in self-defense.  Under Michigan law, one acts lawfully in self-defense if he honestly and reasonably believes that he is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the

16

time of the act. *Blanton v. Elo*, 186 F. 3d 712, 713, n. 1 (6th Cir. 1999)(citing *People v. Heflin*, 434 Mich. 482, 456 N.W.2d 10 (1990)).

Petitioner's trial counsel testified that his strategy was to support the self-defense theory through the testimony of the prosecutor's witnesses. And, in fact, there was testimony developed during the prosecutor's case that did support the defense. Joseph Richardson testified that Petitioner had his back against a wall. James Purifoy testified that Petitioner back-peddled before shooting Auld. Mandel Mays testified that he heard someone from Petitioner's group yell that the victim's group had a gun. Fred Hill admitted that he had a steel rod when the fight began. Dwight Stephenson testified that Auld's group rushed Petitioner's group. And Auld held a significant advantage in terms of height and weight over Petitioner. So this is not a case where Petitioner's counsel attempted to present a defense without any evidentiary support - there was some support for it based on the testimony of the prosecution witnesses.

But there can be little debate that presenting evidence that the victim was armed with a weapon is relevant and important to a claim self-defense because it can demonstrate that the defendant honestly and reasonably believed he was in danger. And none of the prosecution witnesses who testified at trial said that they saw Auld with a weapon or pick up Hill's weapon when he rushed Petitioner. By contrast, the witnesses from Petitioner's group who testified at the hearing before this Court testified that Auld was armed. Kyle McClellan testified that Auld picked up what appeared to be a handgun dropped by Hill before Auld rushed at Petitioner. Calvin Guinn testified that after Auld was shot, he saw that indeed it was a handgun he had been armed with. Ramu McClellan likewise testified that Auld picked up the shiny object dropped by Hill. On the face of things, these witnesses

17

certainly would have provided a description of the fatal encounter between Petitioner and Auld that presented a far more compelling case of self-defense than the description given by the prosecutor's witnesses.

Defense counsel testified regarding his general reasons for not calling defense witnesses.   He talked about the desirability of focusing the jury's attention on the prosecutor's burden of proof, and the fact that there is always a risk that the witnesses will not perform well.   Additionally, Respondent points to inconsistencies between the various uncalled defense witnesses's versions of events, and the differences between their testimony and the police statements - all of which could conceivably support a decision not to call these particular witnesses.   There was also more detail in their hearing testimony than in their affidavits.   All these factor could have supported defense counsel's decision not to call the defense witnesses.

The problem for Respondent is that none of these factors were considered.  Defense counsel had no idea what these witnesses had to offer, and whether the value of their proposed testimony was outweighed by any disadvantages.   The Court finds credible the testimony of the uncalled defense witnessed that they never spoke to defense counsel. The Court also finds credible Petitioner's testimony that his trial counsel told him that his family members would not be needed at trial.   That is, the record demonstrates that defense counsel made a decision that he could prevail on his self-defense theory with only the prosecutor's witnesses without ever conducting any investigation.

Under *Strickland*, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691.   While decisions as to what evidence to present

18

and whether to call certain witnesses are presumed to be a matter of trial strategy, *see Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002), defense counsel must conduct a reasonable investigation into the facts of a defendant's case or make a reasonable determination that such investigation is unnecessary. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).   While a strategic decision to not present evidence is virtually unchallengeable if made after a thorough investigation, if made after less than complete investigation the decision is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.   Inattention or negligence, as opposed to reasoned strategic judgment, is inexcusable. *See Wiggins*, 539 U.S. at 526.

Here, Petitioner's trial counsel did not make an objectively reasonable decision not to call the defense witnesses because he never obtained sufficient information to make a reasonable choice between the alternatives.  For example, defense counsel could not have known that some of Petitioner's witnesses would have testified that Auld had a gun when he ran at Petitioner.  Perhaps even with this knowledge counsel could have made  a reasoned judgement to abstain from calling the witnesses because he thought their testimony was not credible or for some other strategic reason, but here there was no informed decision at all.  Petitioner's counsel was simply not in a position to determine whether the general disadvantages of calling defense witnesses was outweighed by the strength of potential testimony unknown but readily available to him.

This is certainly not a case where the defense theory was so strongly supported by the prosecution witnesses that counsel could make a reasonable determination that  the investigation of possible defense witnesses was completely unnecessary.  None of the

prosecution witnesses testified that Auld was armed.  And none of the prosecution witnesses testified that Petitioner was armed before he entered the bar to rebut the prosecutor's argument that Petitioner retrieved his weapon after he left the bar.

Accordingly, the Court finds that Petitioner's trial counsel performed deficiently by failing to investigate the possibility of calling the men from Petitioner's group as defense witnesses at trial.

To demonstrate that he was prejudiced by his counsel's deficient failure to investigate, Petitioner must show that there is a reasonable probability that the result of his trial would have been more favorable had counsel called these defense witnesses.  The *Strickland* court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Respondent asserts that Petitioner was not prejudiced because the defense witnesses lacked credibility and because Petitioner's self-defense theory is contradicted by the victim's injuries as reported by the medical examiner.   But as the Sixth Circuit explained in *Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003) (emphasis added):

> The actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides.

Even though the jury could have discredited the defense witnesses based on factors such as bias, inconsistencies in their respective stories, and the strength of eyewitness accounts by the "neutral" bar employees, there remains a reasonable probability that the jury would have credited the testimony enough to produce a reasonable doubt as to Petitioner's guilt.

Despite some inconsistencies, the defense witnesses largely agreed on the same

20

scenario: Auld picked up an object that appeared to be a weapon that Hill had on him or dropped when he fell to the ground and then rushed aggressively towards Petitioner. This new testimony is not starkly inconsistent with the testimony of the prosecutor's witnesses, which the jury must have accepted as true. Some of the prosecution's eyewitnesses also saw Auld charge towards Petitioner, and several of them saw that Hill had a weapon before he was knocked-out. The key difference between the two versions is that the defense witnesses testified that they saw Auld retrieve Hill's weapon. Because the testimony of the defense witnesses is not wildly different from the prosecution witnesses's, there is at least a reasonable probability that the jury would have likewise credited it as true, or at least credited it enough to allow a finding of reasonable doubt. All it would have taken is for "one juror [to] have struck a different balance" between the competing stories for Petitioner to have prevailed on his self-defense claim. *Wiggins*, 529 U.S. at 537.

Respondent also asserts that Petitioner cannot show that he was prejudiced by his counsel's failure to call the defense witnesses because the defense had no adequate response to the incriminating location of the victim's wounds. There is no question that the location of the wounds presents a problem for Petitioner. Auld had four bullet wounds: (1) entering the front upper left leg and exiting an inch below the entrance; (2) entering the right side of the upper thigh and exiting the inner right leg; (3) entering the back of the right lower leg and exiting front of the lower right leg; and (4) entering the back of the upper left shoulder and exiting the front of the chest. Respondent contends that these wounds do not correspond to any credible claim of self-defense.

To demonstrate prejudice, however, Petitioner is not required to show that he would surely have been acquitted. He need only show a reasonable probability that the result of

the trial would have been more favorable.  The shooting here occurred in the midst of a melee.  There was testimony presented at the hearing that Auld picked an object off of the ground before he charged at Petitioner, and there was testimony presented at trial that he slipped or stumbled as he ran towards Petitioner.  While only one of the four gunshot wounds entered the front of Auld's body, the location of the other wounds do not conclusively contradict Petitioner claim of self-defense.  On cross-examination, the medical examiner conceded that he did not know the position of Auld's body when he was shot.  He acknowledged that it was possible Auld was "spinning around and falling back" or "stumbling down and to the side," when he was shot.  Trial Tr. 8-6-2002, at 74.  If the jury had heard the uncalled defense witnesses and found their account credible, they could have reasonably concluded that Petitioner's first shot struck Auld in the front of the leg, and that he kept on firing as Auld stumbled, turned, and fell.  Nor was the interval between shots so great as to preclude a finding of self-defense if the jury believed Auld stumbled and fell after the first shot.  The Court cannot conclude that the location of the victim's wounds creates less than a reasonable probability that the result of Petitioner's trial would have been different had the uncalled defense witnesses testified.

Moreover, there is a reasonable probability that the uncalled defense witnesses would have benefitted the defense in another way.  They would have undermined the prosecutor's argument that Petitioner premeditated the murder because he retrieved the handgun after he left the bar.  The prosecutor based this argument on the fact that the bar's security guard testified that he searched everyone who entered the bar and that no one who entered could have been armed.  The defense witnesses' testimony about how they snuck Petitioner into the bar with a handgun is plausible.  In fact, it is supported by the

22

undisputed fact that Petitioner - who was underage - was able to enter the bar without the security guard checking his identification. There is a reasonable probability that the jury would therefore have believed that Petitioner was also able to sneak into the bar with a handgun.

It is true that the prosecutor argued in the alternative that Petitioner had enough time to premeditate the killing while he was holding the gun just prior to the shooting. But again, Petitioner need not prove beyond all doubt that the jury would not have found premeditation. He need only show a reasonable probability. And because of the significance the prosecutor placed on the evidence that Petitioner did not have a handgun in the bar on establishing this element, there is more than just a mere possibility of prejudice. Accordingly, even setting aside the fact that the defense witnesses would have supported Petitioner's self-defense claim, there is a reasonable probability that their testimony would have at least resulted in the more favorable verdict of guilty of second-degree murder.

None of this is to say that the Court believes that Petitioner acted in self-defense or that he acted without premeditation. Rather, the evidence presented at the hearing shows that Petitioner's counsel's deficient failure to investigate sufficiently undermines the Court's confidence in the outcome of the trial. The case was relatively straight-forward. Two groups of men were involved in a bar fight and someone was shot and killed. The jury heard the version of events from the victim's group but never heard the version of events from the accused's group. That, in itself, is not a problem. But when, as here, it turns out that the accused's attorney never bothered to investigate what members of his client's group would say, and it turns-out that their version would have significantly supported a

23

claim of self defense, it follows that the attorney was not acting as "counsel" as contemplated by the Sixth Amendment and that his failings undermine confidence in the outcome of the trial.  Therefore, Petitioner has demonstrated entitlement to habeas relief based on his claim of ineffective assistance of trial counsel.

### D.  Petitioner's Remaining Claims

### 1. Sufficiency of the Evidence

Petitioner's remaining claims are without merit.  Petitioner claims that constitutionally insufficient evidence was presented at trial to support the elements of premeditation and deliberation.  The Michigan Court of Appeals rejected this claim on the merits during Petitioner's direct appeal.  Therefore, to demonstrate entitlement to habeas relief based on this claim, Petitioner must overcome the strictures of § 2254(d) and show that the state court decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

Under this standard, "state-court decisions must be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997).  "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S.Ct. 770 (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

24

disagreement." *Id.*

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (*quoting Jackson*, 443 U.S. at 324 n. 16). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajty*s, 319 F.3d 780, 788 (6th Cir. 2003) (*citing Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *See People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); MICH. COMP. LAWS 750.316. Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170, 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999).

25

The Michigan Court of Appeals held that the prosecution presented sufficient evidence to support Petitioner's conviction beyond a reasonable doubt. The court explained:

> Defendant argues that there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction. We disagree. Challenges to the sufficiency of the evidence in criminal trials are reviewed de novo to determine whether, in a light most favorable to the prosecutor, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Randolph*, 466 Mich. 532, 572; 648 N.W.2d 164 (2002). To establish first-degree premeditated murder, some time span between the initial homicidal intent and the ultimate action is necessary to establish premeditation and deliberation, and the interval should be long enough to afford a reasonable person time to take a "second look." *People v. Gonzalez*, 468 Mich. 636, 641; 664 N.W.2d 159 (2003).

> Premeditation and deliberation may be established by evidence of (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide. Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime. [*People v. Abraham*, 234 Mich. App. 640, 656; 599 N.W.2d 736 (1999) (citations omitted).]

> Absent exceptional circumstances, issues of witness credibility are for the jury. *People v. Lemmon*, 456 Mich. 625, 642; 576 N.W.2d 129 (1998). "This Court will not interfere with the role of the trier of fact of determining the weight of the evidence or the credibility of witnesses." *People v. Hill*, 257 Mich. App. 126, 141; 667 N.W.2d 78 (2003).

> The relationship between the victim and defendant consisted of an argument between their two groups of friends inside a club that evening. There was circumstantial evidence to support an inference that, before the killing, defendant retrieved the gun and a jacket from a nearby vehicle. The medical examiner testified that the victim was shot four times through-and-through, and his body was in motion at some time between the first and last gunshots. After the homicide, defendant fled. Pursuant to *Abraham, supra*, this is sufficient evidence of premeditation and deliberation. The act of retrieving the gun was sufficient time to afford a reasonable person time to take a "second look." *Gonzalez, supra*. Viewed in a light most favorable to the prosecution, the evidence presented at trial was sufficient to

26

permit a rational jury to conclude that defendant committed first-degree murder. *Randolph, supra*.

*McClellan, supra*, 2004 Mich. App. LEXIS 1324, *1-3..

This decision did not result from an unreasonable application of the established Supreme Court standard. Viewed most favorably to the prosecution, the evidence presented at trial allowed a reasonable fact-finder to conclude beyond a reasonable doubt that Petitioner acted with premeditation and deliberation either when he returned to his vehicle to obtain the handgun or in the moments that he held the gun at his side once the altercation with Auld's group began. At a minimum, the state court's conclusion that the evidence was sufficient was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter.* Relief is therefore barred under § 2254(d).

## 2. Prosecutorial Misconduct

Petitioner next claims that the prosecutor committed misconduct during opening statements and closing arguments. Respondent asserts that the allegations of misconduct are procedurally defaulted because Petitioner did not object to many of them at trial, and because he did not raise the claim on federal constitutional grounds in the state courts. Defaulted or not, however, the claims do not provide a basis for granting habeas relief because they are without merit. *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis where resolution of the default issue entailed unnecessary complications).

Petitioner first claims that the prosecutor's remarks during the opening statements

27

violated his Fifth Amendment right against self-incrimination.  The prosecutor stated during opening that none of the members of Petitioner's group who were at the bar would be testifying because they all fled from the scene after the shooting, whereas the members of the victim's ground stayed.

A prosecutor may not shift the burden of proof to a defendant. *See, e.g., United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir.1993).  A prosecutor may, however, highlight inadequacies in the defense, *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005), and point out the lack of evidence supporting the defense theory. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).  The prosecutor's tactic of calling into question the validity of Petitioner's defense by highlighting the fact that it lacked evidentiary support from the testimony of witnesses present at the scene was not improper.  Of course, that this argument could be made by the prosecutor highlights again Petitioner's counsel failure to call any members of Petitioner's group as witnesses.

Petitioner next claims that the prosecutor argued facts not in evidence.  Specifically, the prosecutor stated during his opening that one witness from Petitioner's group who stayed at the scene had since disappeared and could not be located by police.  Although it is possible for a prosecutor's comments during opening statements to be so prejudicial as to support a finding of constitutional error, there is no error if the prosecutor gives an "objective summary of evidence which the prosecutor reasonably expects to produce," even if events at trial prevent the prosecutor from actually presenting that evidence. *Frazier v. Cupp*, 394 U.S. 731, 736 (1969).  Although the prosecutor never presented evidence at trial that the witness in question disappeared after the crime, there is no indication that the remark was made in bad faith.  Accordingly, the comment did not deprive Petitioner of a

28

fair trial.  *See, e.g., Thomas v. Garraghty*, 18 F. App'x 301, 311 (6th Cir. 2001) (prosecutor did not engage in deliberate misconduct by calling witness who he knew would claim a Fifth Amendment privilege where he believed that the witness did not have a valid privilege and he believed that he could put witness on stand to preserve his own credibility).

Petitioner also claims that the prosecutor vouched for the credibility of the eyewitnesses who testified at trial.  A prosecutor may not express a personal opinion concerning the credibility of trial witnesses because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof."  *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir.1999).  However, a prosecutor is free to argue that the jury should arrive at a particular conclusion based upon the record evidence.  *Id.*  It is worth noting that the Sixth Circuit has never granted habeas relief for improper vouching.  *Byrd v. Collins*, 209 F.3d at 537 and n. 43.  The comments here were not flagrant.  They appeared to be a response to defense counsel's attacks on the witnesses's credibility and based on the evidence presented at trial.

Petitioner also asserts that the prosecutor disparaged him by referring to him as a troublemaker, jerk, and idiot.  The prosecutor's comments did not rise to the level of a constitutional violation. *See Hutchison v. Bell*, 303 F. 3d 720, 750-51 (6th Cir. 2002) (denying habeas claim of prosecutorial misconduct based on references to defendant as having "evil ways" and being "an evil force").   After the complained-of remark, the prosecutor explained that he was referring to "jerks and idiots" encountered in daily life. He also asked the jury to focus on the evidence presented in reaching their verdict.  The

remarks, though undesirable, did not render Petitioner's trial unfair.

Finally, Petitioner asserts that the prosecutor appealed to the civic duty of the jury by asserting that a guilty verdict would bring a sense of justice to the victim's death. "'Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.'" *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir.2000) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir.1991)).  A prosecutor does not overstep by appealing to the jurors' sense of justice. *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009).  Petitioner has failed to show that the prosecutor made the statement with the intention of inciting the passions or prejudices of the jurors.  The prosecutor's language was not inflammatory nor does it appear intended to incite passions or prejudices.  Further, the trial court instructed the jury to base their decision only on the evidence and the law, not on their sympathies or prejudices. *See Cameron v. Pitcher*, 2001 U.S. Dist. LEXIS 787, 2001 WL 85893, *10 (E.D. Mich. Jan. 4, 2001) (holding that jury instruction advising jurors they were required to decide facts on basis of properly admitted evidence mitigated prosecutor's civic duty argument).  Petitioner has not demonstrated that this comment rendered Petitioner's trial unfair.

Accordingly, Petitioner's prosecutorial misconduct claim is also without merit.

### III. <u>Conclusion</u>

The Court concludes that Petitioner was denied the effective assistance of counsel at trial in violation of the Sixth Amendment.  He is therefore being held in custody in violation of his constitutional rights.  Accordingly, **IT IS ORDERED** that the petition for writ of habeas corpus is **GRANTED**.  Respondent is **ORDERED** to release Petitioner from custody imposed by the Judgment of Sentence entered in Wayne Circuit Court No. 02-003088 within ninety (90) days.  Nothing in this Opinion and Order should be construed as barring re-arrest on the original charges pending new trial after his release from the illegal judgment of sentence.

S/Bernard A. Friedman_____
**HON. BERNARD A. FRIEDMAN**
DATED: June 14, 2011          UNITED STATES DISTRICT JUDGE